# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF INDIANA
# INDIANAPOLIS DIVISION

| | |
|---|---|
| RON BALOGUN, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 05-CV-1790 |
| MIDLAND CREDIT MANAGEMENT, INC.; MIDLAND FUNDING NCC-2 CORP.; and ENCORE CAPITAL GROUP, INC., formerly MCM CAPITAL GROUP, INC., | ) Judge Larry J. McKinney ) ) Magistrate Judge William T. Lawrence ) |
| Defendants. | ) ) |

## ANSWER TO CLASS ACTION COMPLAINT

Defendants, Midland Credit Management, Inc. ("MCM"), Midland Funding NCC-2 Corp. ("Midland Funding NCC-2"), and Encore Capital Group, Inc., formerly MCM Capital Group, Inc. ("Encore") (collectively referred to as "Defendants"), by and through their attorneys, file the following answer and affirmative defenses to the complaint and state:

## INTRODUCTION

1. Plaintiff Ron Balogun brings this action to secure redress against unlawful collection practices engaged in by defendants Midland Credit Management, Inc., Midland Funding NCC-2 Corporation, and Encore Capital Group, Inc., formerly known as MCM Capital Group, Inc ("Encore"). Plaintiff alleges violation of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et seq. ("FDCPA") through an "account balance transfer program," pursuant to which private information concerning debtors and debts was provided to unauthorized third parties for the purpose of collecting the debts.

**ANSWER:**   Defendants admit that Plaintiff has made allegations in the Complaint relating to the FDCPA, but deny any and all liability to Plaintiff.

## JURISDICTION AND VENUE

2. This Court has jurisdiction under 28 U.S.C. §§1331, 1337 and 15 U.S.C. § 1692k (FDCPA). Venue in this District is proper because defendants' collection communications were received in this District.

**ANSWER:**   Admitted. Midland Funding NCC-2 and Encore deny that they send

communications.

## PARTIES

### Plaintiff

3. Plaintiff Ron Balogun resides in Indianapolis, IN.

**ANSWER:** Defendants lack information or knowledge sufficient to form a belief as to the truth of this allegation, and therefore deny the same.

### Midland Funding NCC 2 Corporation

4. Defendant Midland Funding NCC-2 Corporation is a Delaware corporation. Its address for service of process is The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 (*sic*).

**ANSWER:** Admitted.

5. Defendant Midland Funding NCC-2 Corporation is in the business of buying charged-off debts allegedly owed by consumers, including large amounts of credit card debts, for a small fraction of face value and enforcing the debts against the consumers.

**ANSWER:** Midland Funding NCC-2 admits that it is in the business of buying charged-off debts allegedly owed by consumers, but denies the remaining allegations contained in Paragraph number 5.

6. Defendant Midland Funding NCC-2 Corporation is a "debt collector" as defined in the FDCPA.

**ANSWER:** Denied.

7. Defendant Midland Funding NCC-2 Corporation transacts business in Indiana.

**ANSWER:** Denied.

### Midland Credit Management

8. Defendant MCM is a Kansas corporation with its principal place of business at 8875 Aero Drive, Suite 200, San Diego, CA 92123. MCM transacts business in Indiana. Its registered agent and office are CT Corporation System, 208 S. LaSalle St., Chicago, IL 60604.

**ANSWER:** Admitted that MCM is a Kansas corporation with its principal place of business at

2

8875 Aero Drive, Suite 200, San Diego, CA 92123, but only through and exclusively through interstate commerce.

9. Defendant MCM is a collection agency and collects the charged-off debts purchased by Midland Funding NCC-2 Corporation, among others.

**ANSWER:** MCM admits that it may be considered a collection agency FDCPA, for some purposes. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegation that it acted as a collection agency with respect to Plaintiff, because it is without knowledge or information sufficient to form a belief as to the purpose of Plaintiff's debt.

10. Defendant MCM is a "debt collector" as defined in the FDCPA.

**ANSWER:** MCM admits that it may be considered a debt collector, as defined by the FDCPA, for some purposes. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegation that it acted as a debt collector with respect to Plaintiff, because it is without knowledge or information sufficient to form a belief as to the purpose of Plaintiff's debt.

### Encore

11. MCM and Midland Funding NCC-2 Corporation are under common ownership. Both are subsidiaries of Encore, a publicly traded Delaware corporation, with offices at 8875 Aero Drive, Suite 200, San Diego, CA 92123.

**ANSWER:** Admitted.

12. Encore describes itself as "a leading accounts receivable management firm" and a "purchaser and manager of charged-off consumer receivables portfolios". (Form 8-K filed by Encore with the SEC on March 3, 2005.)

**ANSWER:** Encore admits that Plaintiff cites to a portion of the Form 8-K filed by Encore with the SEC on March 3, 2005. The document speaks for itself, therefore no response is required.

13. On March 10, 2005, Encore stated to public investors that it is a "50 year old purchaser and manager of consumer receivables portfolios." (Form 8-K filed by Encore with the SEC on March 10, 2005.)

**ANSWER:** Encore admits that Plaintiff cites to a portion of the Form 8-K filed by Encore with the SEC on March 10, 2005. The document speaks for itself, therefore no response is required.

14. Encore "acquires these portfolios at deep discounts from their face values", (Form 10-K filed by Encore with the SEC for the year ending December 31, 2004, original p. 2.) By "deep discount" is meant 1.8% to 3.86% of face value. (Id. original p. 28)

**ANSWER:** Encore admits that Plaintiff cites to a portion of the Form 10-K filed by Encore with the SEC for the year ending December 31, 2004. The document speaks for itself, therefore no response is required. Encore denies the remaining allegations contained in Paragraph 14.

15. Encore states that it is responsible for developing collection strategies. Thus, on March 3, 2005, Encore stated to public investors that "Our fourth quarter performance capped a very strong year for Encore, as we generated record levels of collections, revenues, and earnings per share…. We were able to achieve this strong growth despite scaling back on our purchasing of new portfolios throughout much of 2004 in response to less attractive pricing in the marketplace. Total purchases during 2004 were $103.4 million compared to $89.8 million in 2003. We continue to effectively develop alternative collection channels, such as legal and agency outsourcing, which increase our ability to penetrate our portfolios further…." The statement was made by Carl C. Gregory, III, then Vice Chairman and CEO of Encore Capital Group, Inc. (Form 8-K filed by Encore with the SEC on March 3, 2005.)

**ANSWER:** Encore admits that Plaintiff cites to a portion of the Form 8-K filed by Encore with the SEC on March 3, 2005. The document speaks for itself, therefore no response is required. Encore denies the remaining allegations contained in Paragraph 15.

16. One of the collection strategies developed by Encore is the "account balance transfer program." Encore's annual report on SEC Form 10-K, for the 12 months ending Dec. 31, 2003, states (original p. 10):

> *Account Balance Transfer.* We may transfer to our credit card partner accounts with a low expected value or those for which collection efforts have failed. The credit card partner may offer the debtor the opportunity to put the balance on a credit card. If the account is transferred we receive an agreed upon payment. We retain the ownership of and the ability to collect on the charged-off accounts that the card issuer has solicited until a successful balance- transfer has occurred.

4

The "credit card partner" is or includes Capital One.

**ANSWER:** Encore admits that Plaintiff cites to a portion of Encore's annual report on SEC Form 10-K for the 12 months ending December 31, 2003. The document speaks for itself, therefore no response is required. Encore denies the remaining allegations contained in Paragraph 16.

17.   Encore's 10-K for the year ending Dec. 31, 2004 explicitly describes "the transfer of accounts to a credit card provider, generating a payment to us" as one of its "collection strategies." (original pp. 3, 6)

**ANSWER:** Encore admits that Plaintiff cites to a portion of the Form 10-K filed by Encore with the SEC for the year ending December 31, 2004. The document speaks for itself, therefore no response is required.

18.   Encore is also responsible for raising money to purchase the charged-off debts.

**ANSWER:** Denied.

19.   On March 3, 2005, Encore CEO Gregory stated in an earnings conference call:

> It's notable that we achieved this strong growth despite scaling back on our purchases of new portfolios for the better part of 2004, because of a less attractive pricing environment. As we have mentioned many times, one of our competitive advantages is our varied business model that makes use of several different collection channels. During the fourth quarter we continued to see increased production out of our legal channel and our contingent agency outsourcing channel, which was developed earlier in 2004. For the full year, our collections through alternative channels, with the exception of the sales channel, more than doubled.
>
> Turning to the purchasing market, our purchases for the first three quarters of the year were relatively modest, because of what we deemed to be a lack of opportunities that met our high standards. The market continues to be highly competitive, and it's looking like it could remain that way for quite a while. Accordingly, we have adjusted our strategy to reflect the current environment. We determined that we should not bypass profitable opportunities simply because they could not generate the high level of returns we have typically demanded, there are sufficient opportunities to purchase portfolios that can be nicely profitable for the Company. And in the current environment, it's in our best interest to acquire these portfolios rather than waiting for prices to come down

>    With that being said, we invested $46.1 million in new portfolios in the fourth quarter, at an average purchase price of 3.86 percent of face value. Almost all of these purchases were credit card portfolios and that's where we found the most attractive opportunities in the fourth quarter. These purchases were made with our former credit facility that expired at the end of the year. We were able to modify the terms of that credit facility during the fourth quarter, to put a ceiling on the total interest that we will have to pay on these portfolios. The lower interest expense associated with these portfolios will help offset the higher prices, and the resulting lower collection multiples and enable these portfolios to still generate nice profits for the Company.

**ANSWER:**   Encore admits that Plaintiff cites to certain statements made by Encore CEO Gregory on a March 3, 2005 earnings conference call.  Encore denies that the allegations contained in Paragraph 19 represent a true and correct version of the statements made by Encore CEO Gregory.

  20.   On Oct 28, 2004, Encore CEO Gregory stated in another earnings conference:

>    …Our board also elected Brandon Black, President and Chief Operating Officer of the Company. Brandon has been Executive Vice President and Chief' Operating Officer for the past 5 years and has done a superb job. Brandon is the architect of many of the analytical procedures and collection processes that distinguish Encore's approach to the business. His intelligence, analytical ability and drive for success have been instrumental in Encore's success and in his new role will be key factors as we continue to build the business....
>
>    Turning now to the quarter's results on Slide 3. Once again they were very good. Compared with the third quarter of 2003, collections were up 22 percent; revenue had an increase at 57.5 percent; pre-tax operating cash flow was up 82.1 percent; net income was up 89.5 percent; and earnings per fully diluted share came in at 25 cents. 66.7 percent higher than the same quarter last year. This continues the strong performance we experienced during the first 2 quarters of this year and is attributable to both our disciplined approach to purchasing and our multifaceted approach to collecting.
>
>    As we have said before, we believe the use of customer level analytics to drive purchasing and collections is a key distinguishing characteristic of Encore.
>
>    On the purchasing front, we invested $21 million in new portfolios during the quarter, up 10 percent from the prior year's quarters purchases of $19 million. Our average purchase price for the quarter was 2.91 percent which was down slightly from last year's 3.02 percent.  This was not as much as we had hoped to invest but appropriate given the high prices for much of the available supply.
>
>    Year-to-date, our purchases have been $57 million or about $7 million less than last year's first 3 quarters. For the year-to-date, approximately 48 percent of our purchases have

> been non-credit card, compared with just 6 percent last year for the same period. We will have more to say about purchasing in a minute but the purchasing discipline and analytical approach we've always taken are more important now than ever before…

**ANSWER:** Encore admits that Plaintiff cites to certain statements made by Encore CEO Gregory on a October 28, 2004 earnings conference call. Encore denies that the allegations contained in Paragraph 20 represent a true and correct version of the statements made by Encore CEO Gregory.

21. On Oct. 28, 2004, Encore COO Brandon Black stated in the same earnings conference call:

> Our most recent innovation is ... the development of a targeted agency outsourcing program. In contrast to the typical outsourcing cycle that moves static pools of accounts from agency to agency on a prescribed rotation, we are using our analytics to determine those individual accounts that cannot be profitably collected through our internal processes and are placing them with outside partners to generate incremental returns.
>
> In general, as we said before, we expect about 80 percent of the accounts we purchased to pay us nothing during our ownership period. Recognizing that as a huge opportunity, we started a business development team late in 2003 to pursue new strategies for penetrating that large pool of accounts. Some areas of focus for us were low balances, accounts with no contact information and accounts beyond their legal statutes.
>
> In the third quarter of 2004, collections from this channel amounted to $4.6 million, up from nothing in 2003. We believe much of these collections are incremental to our champion strategy and that channel will grow in 2005 and beyond. We are continually pursuing profitable liquidation strategy that will leverage our talented and deep management team. We believe our account level analytics will continue to unlock additional value on our portfolios and this approach should keep improving liquidation of our entire portfolio and provide flexibility to buy in the future.

**ANSWER:** Encore admits that Plaintiff cites to certain statements made by Encore COO Black on a October 28, 2004 earnings conference call. Encore denies that the allegations contained in Paragraph 21 represent a true and correct version of the statements made by Encore COO Black.

22.    On Aug. 3, 2004, Encore CEO Gregory stated in another earnings conference call:

> Encore enjoyed another good quarter. Our collections, revenue and net income all increased. In addition, we closed a terrific new loan with J.P. Morgan Chase that dramatically lowers our cost of borrowing, increases our flexibility, and should result in better financial returns for Encore.
>
> Finally, just after the end of the quarter, we closed the biggest purchase we've ever made on terms we considered quite attractive. We are very excited about our industry and its future, but most importantly, Encore's ability to excel in the future.
>
> Barry will go into detail about our results in a moment, but I would like to share with you the highlights shown on slide three. Compared with the second quarter of 2003, our collections were up 23 percent, revenue increased 54 percent, pre-tax operating cash flow was up 84 percent after the exclusion of the onetime benefit in Q2 of 2003, and net income grew by 69 percent... .
>
> Continuing on to slide four, the most noteworthy accomplishment in the quarter other than our strong financial results was the closing of our new loan. It is a material improvement over our previous arrangement and it provides the flexibility the Company needs for the remainder of 2004 and beyond. The financial terms are better in two key areas.
>
> First, we had the choice of tying our investments to either prime plus zero or Euro dollar plus an applicable spread, which can vary between 200 and 300 basis points. Our old loan had a base rate of prime plus 200 to 300 basis points depending on the amount outstanding. As nice as this improvement is, the most important difference is that the new loan has no contingent interest feature, or any other participation feature. All other things being equal, the absence of future contingent interest expense will contribute to a big improvement in Encore's financial results.
>
> Encore recorded contingent interest of $16 million for all of 2003 and $17 million in the first six months of this year. To put this in perspective, if you could completely eliminate contingent interest in the first half of 2004, our earnings per share would have been 94 cents, or 88 percent higher. Although we will continue to pay contingent interest on those portfolios financed with our secured financing facility, it will decrease rather rapidly. In 2005, we expect it to be only 60 to 65 percent of the 2004 amount, and in 2006 only about 25 or 30 percent of the '04 expense, before it completely goes away, which could in effect double our net income over this period before factoring in any underlying business growth.

**ANSWER:**    Encore admits that Plaintiff cites to certain statements made by Encore CEO

Gregory on a August 3, 2004 earnings conference call.  Encore denies that the allegations

8

contained in Paragraph 22 represent a true and correct version of the statements made by Encore CEO Gregory.

    23.    On Aug. 3, 2004, Encore CEO Gregory stated in the same call:

> We believe our business model is especially well-suited to this changing environment: Specifically, our business model emphasizes customer-level rather than portfolio-level analytics, innovative and flexible collection processes and conservative accounting.
>
> The keystone to everything we do is customer-level analytics -- understanding the individual customer and his changing ability to pay. Prior to purchase and throughout our ownership, we analyze the individual customers ability and willingness to pay. We are always asking the same question -- can this particular customer pay us all or some of what he owes now? By focusing on the customer and information about him, we are able to move comfortably across various asset types as well as the portfolio ages or time since charge-off. In this process, a score is generated for every single account we own and the score is refreshed quarterly to ensure that it maintains its accuracy.
>
> The second major aspect of our business model is our use of innovative collection strategies that are driven by the underlying collectibility score of each customer. In other words, to fully benefit from the new information we are generating about the individual customers, we have to be able to apply different collection strategies as appropriate, or at least be able to apply the traditional approaches in new ways that will be more effective.
>
> We now have eight unique revenue channels that each contribute more than $1 million per month in collections, including direct mail, **balance transfer**, external legal, and our recently developed agency outsourcing strategy. (Emphasis added)

The "balance transfer" referred to is the same as is described above.

**ANSWER:**    Encore admits that Plaintiff cites to certain statements made by Encore CEO Gregory on a August 3, 2004 earnings conference call. Encore denies that the allegations contained in Paragraph 23 represent a true and correct version of the statements made by Encore CEO Gregory. Further answering, Encore denies the remaining allegations contained in Paragraph 23.

    24.    On March 2, 2004, Encore CEO Gregory stated in another earnings conference call:

> ... For the year, collections, revenues, net income, and cashflow from operations were up 28%, 30%, 34%, and 38% respectively over 2002. You can see this on slide 3. As we

> look at these numbers more closely we see that for the year we collected $190.5 million, a 28% increase over 2002's $148.8 million. This number does not include the $11.1 million we received from the settlement of litigation during the first quarter of 2003.
>
> Revenues for the year were $117.5 million, a 30% increase over last year's $90.4 million. Net income for the year was $18.4 million, a 34% increase over $13.8 million in 2002. Finally, cashflow from operations for all of 2003 was $33.9 million, 37% greater than last year's $24.7 million ... .

**ANSWER:**   Encore admits that Plaintiff cites to certain statements made by Encore CEO Gregory on a March 2, 2004 earnings conference call. Encore denies that the allegations contained in Paragraph 24 represent a true and correct version of the statements made by Encore CEO Gregory.

25.   On March 2, 2004, Encore CEO Gregory also stated:

> ... Some comments about pricing seem in order. I believe that there's been a general rise in the price of credit card paper. If we look at slide 19, it will help us talk about this. The price increases haven't been uniform across the age spectrum and have ranged from very small increases to over 25%, with the greatest increases generally being in the older paper. Remember also that there are several factors besides market conditions that affect the average purchase price. Two of the most important ones are the mix and age of the assets purchased. As you can see, in 2003, our average price per quarter varied quite a bit quarter to quarter. It was 3.2 cents in the first quarter, 2.2 cents, 3.0 cents, and 2.9 cents in the fourth quarter. The fourth quarter of-- was actually lower than the third quarter-- or the first quarter of 2003 and lower than the fourth quarter of 2002. 1 believe that at every price point we've been able to make attractive purchases that will yield the results that we anticipate.
>
> We, like all of our competitors, would prefer that prices decline. Until that happens, I'm satisfied that Encore's unique pricing practices and collection tools are more valuable than ever in choosing and working the best portfolios available. According to the federal reserve, the amount of credit outstanding and the delinquencies are continuing to rise; though the supply seems to be growing. However, our visible success and that of some of our competitors have continued to attract more money into the business. The majority of this money is flowing into established funds with solid business models and, I hope, the discipline to stick with it. However, there are some aggressive bidders who may not fully appreciate how difficult this business is, or be motivated solely by growth objectives. If this is true, then in a year or so we may find some of these firms back on the sidelines trying to work their way out of a problem. Of course, they may have a different, better business model and the higher prices work just fine for them....

**ANSWER:**    Encore admits that Plaintiff cites to certain statements made by Encore CEO Gregory on a March 2, 2004 earnings conference call. Encore denies that the allegations contained in Paragraph 25 represent a true and correct version of the statements made by Encore CEO Gregory.

26.    Encore is therefore a "debt collector" as defined in the FDCPA.

**ANSWER:**    Denied.

## FACTS RELATING TO PLAINTIFF

27.    On or about March 4, 2005, MCM sent plaintiff the letter attached as <u>Exhibit A</u> seeking to collect a debt incurred for personal, family or household purposes.

**ANSWER:**    MCM admits that Exhibit A purports to be a collection letter that it sent to the Plaintiff. MCM lacks information or knowledge sufficient to form a belief as to whether Exhibit A has been altered or revised from its original condition.

28.    <u>Exhibit A</u> was sent on behalf of Midland Funding NCC-2 Corporation, which holds title to the debt.

**ANSWER:**    Admitted.

29.    On or about June 15, 2005, MCM sent or caused to be sent to plaintiff the letter attached as <u>Exhibit B,</u> seeking to collect the same debt. The document was sent on behalf of Midland Funding NCC-2 Corporation, which holds title to the debt.

**ANSWER:**    MCM admits that Exhibit B purports to be a collection letter that it sent to the Plaintiff. Defendants lack information or knowledge sufficient to form a belief as to whether Exhibit B has been altered or revised from its original condition.

30.    On information and belief, based on discovery obtained in other litigation, <u>Exhibit B</u> is only sent to a debtor after information concerning the debtor and the debt is sent to Capital One for review and approval.

**ANSWER:**    Because the phrase "only sent to a debtor after information concerning the debtor and the debt is sent to Capitol One for review and approval" is vague and ambiguous, MCM lacks

11

information or knowledge sufficient to form a belief as to the truth of this allegation, and denies the same.

      31.    <u>Exhibit B</u> is a form letter.

**<u>ANSWER:</u>**    Because "form letter" is vague and ambiguous, MCM lacks information or knowledge sufficient to form a belief as to the truth of this allegation, and denies the same.

      32.    <u>Exhibit B</u> is a document used for the purpose of carrying out the "account balance transfer" program described above.

**<u>ANSWER:</u>**    Because the phrase "document used for the purpose of carrying out the 'account balance transfer' program" is vague and ambiguous, MCM lacks information or knowledge sufficient to form a belief as to the truth of this allegation, and denies the same.

      33.    On July 6, 2005, MCM sent plaintiff <u>Exhibit C,</u> relating to the same debt. The document was sent on behalf of Midland Funding NCC-2 Corporation, which holds title to the debt.

**<u>ANSWER:</u>**    MCM admits that Exhibit C purports to be a collection letter that it sent to the Plaintiff. Defendants lack information or knowledge sufficient to form a belief as to whether Exhibit C has been altered or revised from its original condition.

      34.    On Sept. 19, 2005, MCM sent plaintiff <u>Exhibit D</u>, relating to the same debt. The document was sent on behalf of Midland Funding NCC-2 Corporation, which holds title to the debt.

**<u>ANSWER:</u>**    MCM admits that Exhibit D purports to be a collection letter that it sent to the Plaintiff. Defendants lack information or knowledge sufficient to form a belief as to whether Exhibit D has been altered or revised from its original condition.

### **PRIVACY PROTECTIONS IN FDCPA**

      35.    The FDCPA contains a number of provisions that prevent debt collectors from informing third parties that a given individual owes a debt. "[T]he FDCPA generally protects the consumer's privacy by limiting debt collector communications about personal affairs to third parties...." FTC Official Staff Commentary on the Fair Debt Collection Practices Act, 53 Fed. Reg. 50097 (Dec. 13, 1988), at 50103.

**ANSWER:** Defendants admit that Plaintiff cites to a portion of the FTC Official Staff Commentary on the FDCPA, but deny any implication that they violated any provision thereof.

36. 15 U.S.C. §1692c(b) contains a general prohibition against debt collectors communicating with third parties:

> **(b) Communication with third parties--Except as provided in section 1692b of this title, without the prior consent of the consumer given directly to the debt collector, or the express permission of a court of competent jurisdiction, or as reasonably necessary to effectuate a postjudgmcnt judicial remedy, a debt collector may not communicate, in connection with the collection of any debt, with any person other than the consumer, his attorney, a consumer reporting agency if otherwise permitted by law, the creditor, the attorney of the creditor, or the attorney of the debt collector.**

Section 1692b deals with locating debtors who cannot be found and is not pertinent here.

**ANSWER:** Defendants admit that Plaintiff cites to FDCPA Section §1692c(b), but deny any implication that they violated any provision thereof.

37. Second, 15 U.S.C. § 1692d(3) and (4) defines as "harassment" and a violation of the FDCPA **"[t]he publication of a list of consumers who allegedly refuse to pay debts, except to a consumer reporting agency or to persons meeting the requirements of section 1681a(f) or 1681b(3) of this title"** and the **"advertisement for sale of any debt to coerce payment of the debt."** Section 1681 a(f) is the Fair Credit Reporting Act definition of consumer reporting agency. Section 1681 b(3) is a Fair Credit Reporting Act provision dealing with use of consumer reports.

**ANSWER:** Defendants admit that Plaintiff cites to FDCPA Sections § 1692d(3) and (4), but deny any implication that they violated any provision thereof.

38. The Federal Trade Commission has interpreted these provisions to bar publication to one or more persons: "Debt collectors may not exchange lists of consumers who allegedly refuse to pay their debts... A debt collector may not distribute a list of alleged debtors to its creditor subscribers," FTC Official Staff Commentary on the Fair Debt Collection Practices Act, 53 Fed. Reg. 50097 (Dec. 13, 1988), at 50105.

**ANSWER:** Defendants admit that Plaintiff recites a portion of the FTC Official Staff Commentary on the FDCPA, but deny any implication that they violated any provision thereof.

39. Section 1692f prohibits a debt collector from communicating with consumers in a manner that allows third parties to discern the consumers owe money.

> ... (7) Communicating with a consumer regarding a debt by post card,

13

(8) Using any language or symbol, other than the debt collector's address, on any envelope when communicating with a consumer by use of the mails or by telegram, except that a debt collector may use his business name if such name does not indicate that he is in the debt collection business...

**ANSWER:** Defendants admit that Plaintiff cites to FDCPA Section § 1692f, but deny any implication that they violated any provision thereof.

## VIOLATIONS ALLEGED

40. The provision of information to Capital One pursuant to the "account balance transfer program" described above is a disclosure of information concerning a debt for the purpose of collecting the debt to persons other than "the consumer, his attorney, a consumer reporting agency if otherwise permitted by law, the creditor, the attorney of the creditor, or the attorney of the debt collector," in violation of 15 U.S.C. §1692c.

**ANSWER:** Denied.

41. In addition, the "account balance transfer program" involves the publication of lists of persons who have allegedly refused or failed to pay debts, in violation of 15 U.S.C. §1692d.

**ANSWER:** Denied.

42. Each defendant materially participated in the "account balance transfer program."

**ANSWER:** Denied.

## CLASS ALLEGATIONS

43. Plaintiff brings this action on behalf of a class.

**ANSWER:** Defendants admit that this allegation states Plaintiff's intention to bring his claim as a class action but deny the propriety of a class action.

44. The class consists of (a) all natural persons with Indiana addresses (b) who were sent a document similar to Exhibit B (c) on or after a date one year prior to the filing of this action, and (d) on or before a date 20 days after the filing of this action.

**ANSWER:** Defendants admit that this allegation states Plaintiff's intention to bring his claim as a class action but deny the propriety of a class action.

45. All persons sent <u>Exhibit B</u> were included in the "account balance transfer program" and had information concerning them and the purported debts disclosed to Capital One.

**ANSWER:**    Denied.

46. The class members are so numerous that joinder is impracticable. On information and belief, there are more than 50 members of the class.

**ANSWER:**    Denied.

47. There are questions of law and fact common to the class members, which common questions predominate over any questions that affect only individual class members. The predominant common question is whether the `privacy notice" violates the FDCPA.

**ANSWER:**    Paragraph 47 states a legal conclusion for which no answer is required. To the extent that an answer is deemed required, the allegations in Paragraph 47 are denied.

48. Plaintiff's claim is typical of the claims of the class members. All are based on the same factual and legal theories.

**ANSWER:**    Paragraph 48 states a legal conclusion for which no answer is required. To the extent that an answer is deemed required, the allegations in Paragraph 48 are denied.

49. Plaintiff will fairly and adequately represent the interests of the class members. Plaintiff has retained counsel experienced in consumer credit and debt collection abuse cases.

**ANSWER:**    Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of this allegation, and therefore denies the same.

50. A class action is superior to other alternative methods of adjudicating this dispute. Individual cases are not economically feasible. Many debtors may not realize that their rights are violated.

**ANSWER:**    Paragraph 50 states a legal conclusion for which no answer is required. To the extent that an answer is deemed required, the allegations in Paragraph 50 are denied.

## **AFFIRMATIVE DEFENSES**

Further answering the Complaint, and as additional defenses thereto, Defendants incorporate by reference the foregoing answers and affirmative statements as though fully set

15

forth herein, without assuming the burden of proof where such burden is otherwise on Plaintiff as a matter of applicable substantive procedural law, and further alleges as follows:

### FIRST DEFENSE

1. The Complaint fails to state a claim upon which relief may be granted.

### SECOND DEFENSE

2. MCM is not liable for a violation of the FDCPA because any violation, which MCM denies occurred, was not intentional and would have resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid such error.

### THIRD DEFENSE

3. In the event of a judgment, either by this Court or a trier of fact, that either Midland Funding NCC-2 or Encore is a debt-collector under the FDCPA, neither Defendant is liable for a violation of the FDCPA because any violation, which Defendants deny occurred, was not intentional and would have resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid such error.

### FOURTH DEFENSE

4. Defendants specifically reserve all separate or affirmative defenses that it may have against the putative class members.

### FIFTH DEFENSE

5. Defendants expressly reserves the right to raise such additional defenses as may be established during discovery and by the evidence in this case.

WHEREFORE, Defendants respectfully request judgment in their favor and against Plaintiff on all claims asserted by Plaintiff and for such other relief as the Court deems just and proper.

Dated: January 18, 2006

Respectfully submitted,

**MIDLAND CREDIT MANAGEMENT, INC.; MIDLAND FUNDING NCC-2 CORP.; and ENCORE CAPITAL GROUP, INC., formerly MCM CAPITAL GROUP, INC.**

By: s/ Renee L. Zipprich
Richard E. Gottlieb (*rgottlieb@dykema.com*)
James W. McConkey (*jmcconkey@dykema.com*)
Renee L. Zipprich (*rzipprich@dykema.com*)
DYKEMA GOSSETT, PLLC
10 South Wacker Drive, Suite 2300
Chicago, Illinois 60606
Phone: 312-876-1700
Fax:    312-627-2302

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 18, 2006, I electronically filed the foregoing Answer to Class Action Complaint with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to the following:

>Daniel A. Edelman (*courtecl@aol.com*)
>Cathleen M. Combs (*ccombs@edcombs.com*)
>Derek B. Rieman (*drieman@edcombs.com*)
>EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
>120 South LaSalle Street, Suite 1800
>Chicago, IL  60603
>Phone: (312) 739-4200
>Fax:    (312) 419-0379

>s/ Irina V. Frye

CHICAGO\2169264.2
ID\RLZ